The next case today is 23-1072 Ocean State Tactical, LLC, et al. v. State of Rhode Island, et al. Will Attorney Matthew Rowan please step up to the podium? Can you please introduce yourself for the record? Thank you, Your Honors. Matthew Rowan for the appellants. I'd like to reserve five minutes for rebuttal, if I can. You may. The Supreme Court's decision last June in Bruin worked a revolution, wiping the slate clean and reorienting Second Amendment jurisprudence around text, history, and tradition. What is not revolutionary, by contrast, or even new, are the feeding devices and firearms that Rhode Island now bans. Could you get the microphone a little closer? Is that better? Semi-automatic firearms first came onto the scene in the late 19th century, as did the devices that feed ammunition into their firing chambers and allow them to function as intended. But they were very different then. Respectfully, no, Your Honor. I mean, so the, you know, if you want to look at firearms that are the most copied pistol that's still on the market today is the Colt Model 1911 that came out in 1911. And that's a semi-automatic pistol that comes with a detachable magazine. And, you know, there are lots of – there have been lots of technological developments that have happened over the last hundred years. But notably, those aren't the things that House Bill 6614 restricts. No, but it's the combination of things that makes for the dangerousness of the weapon. And certainly there's quite a bit of difference between an assault weapon today and one a hundred years ago. Respectfully, there's not that large of a difference between, for instance, a Browning high-powered that came out in 1935 or an auto-ordnance semi-automatic rifle that came out in the 1920s. And, again, what we're talking about here is simply just a restriction on people's ability to keep and bear feeding devices and firearms that come with fixed magazines. The sort of relevant similarity between arms that existed a hundred years ago and arms that existed today is under Bruin not particularly relevant. I mean, the threshold textual question under Bruin, which is the only part of the inquiry that the district court reached, the threshold textual question is simply whether the conduct in which the plaintiff wants to engage but the challenge law restricts is covered by the plain text. This statute prohibits keeping and bearing a class of instruments. So the only question then is whether those instruments constitute arms. The Supreme Court has told us what, in the Supreme Court's words, is the definition of arms for the Second Amendment. The district court didn't discuss that definition. It relegated it to a footnote and then went on to ask, well, can, you know, a magazine by itself hurt anyone? But that's not the question that the Supreme Court has now instructed lower courts to ask. The definition of arms is whether something is a bearable instrument that facilitates armed self-defense. And, of course, ammunition feeding devices make armed self-defense easier, which is all facilitates means. An ammunition feeding device replaced human muscle for a lever action or a pump action. And the way it works is it siphons off some energy that's created when the trigger is pulled and a round is fired to reload a round into the chamber. Of course... So in your view, counsel, any magazine prohibition would be unconstitutional, even a prohibition that only prohibited the use of magazines capable of holding 100 rounds or more or 200 rounds or more. So no, Your Honor. Because they're all bearable instruments. So no, Your Honor. At the threshold step, the question would just be, is it a bearable instrument that facilitates armed self-defense, right? But that's just the threshold question. Respectfully, a 200-round drum may not actually be bearable. So there might be a limit just on that in the sense of what a person can actually bear. But if you put that aside, so that's just the threshold question. And then you would get to the sort of rub of the matter, which is, is the restriction consistent with our nation's history and tradition of firearm regulation? And Heller and Bruin make very clear that when it comes to a ban on a class of arms, the Court's already done the historical inquiry, and it said there is a tradition of banning the carrying of dangerous and unusual firearms. And so here, applying that standard is very straightforward because in the language of Bruin, ammunition feeding devices that are capable of holding more than 10 rounds are the furthest thing from highly unusual in society at large. One of the studies that was cited below suggests that are found that 48% of all American gun owners have owned at least one of these, that the numbers that have been sold in the last few decades is more than half a billion. And the idea that these arms are highly unusual, which is the language that Bruin used when distinguishing a type of arm that can be banned from a type that can't, which is those in common use, and the idea that something that is this overwhelmingly prevalent in American society is highly unusual just doesn't... You're not suggesting the test is highly unusual. The way the Supreme Court has framed the test is dangerous and unusual. Now, they said that a particular instrument was the furthest thing from highly unusual. That doesn't write the adverb highly into the test. Sure, I mean, whether, you know, I'm just quoting what the Supreme Court said, so if you want to think that... Yes, but are you quoting it in the appropriate context? The test remains whether it's dangerous and unusual. And if the record shows that a large capacity magazine is dangerous and unusual, but not dangerous and highly unusual, then that portion of the test, I suspect, would be met. Sure, I mean, I think highly unusual is actually, you know, quite apt because what the court said in Heller and then reiterated in Caetano is that the unusual question turns on whether the arms are typically possessed by law-abiding citizens for lawful purposes. In Caetano, it was enough, as Justice Alito pointed out in his concurrence, that 200,000 stun guns had been sold in recent years. I mean, we're talking about something that is multiple orders of magnitude greater than that, and that's been on the market for more than 100 years. And so, you know, the tradition test that the Supreme Court has set up, I mean, it obviously operates differently than the test that this court applied in Warman and in other cases, and so it might seem somewhat foreign to look at what the American people have done and have that be what drives the analysis, but it's, at bottom, a tradition test. So let me ask you a couple questions. Do you read the district court has gotten to this step two part of the inquiry? It was the district court said there weren't arms, which, if that were correct, would end the inquiry. Correct. That's all the district court did. The district court did not reach the historical inquiry. So we don't have any facts. So if either side starts citing the portions of the record that show it's favorable to them, we don't have any fact-finding on that by the district court. We, well, we don't have fact-finding, but they would be findings of legislative fact, which would be of no deference to the district court, because we're not talking about what my clients possess. We're talking about what exists in the world. Well, how about who, which expert was credible or not? So credibility of experts may be something that would get deference, but not in the way that the district court applied it here. I mean, the district court credited Professor Barron on what the definition of arms was without asking. No, but I'm talking about credibility of experts on prong two, on step two here. Sure, and I mean, I think on that, actually, no. No deference would be due to any expert on step two, because that would be a legal expert. And there's one legal expert in the district court's courtroom, and that's the judge. But didn't the Supreme Court tell us that we could operate on the presentment theory that, for example, in determining what the history has been, we don't, in fact, go out and do our own historical research. We can depend on the record as presented by the parties. And if you have conflicting evidence by the parties, we would normally ask the district court, what did you think of that conflicting evidence? And if the district court said, that expert seemed shaky to me and I wasn't buying it, then that might be occasion for deference. So there certainly are types of questions where deference might be owed. For instance, what kinds of firearms used to exist? But when you're at the second, when you're at what we think is really the only question under Bruin, because we think that the threshold question is really just sort of a gatekeeping function to make sure you're sort of in the ballpark. But once you're at the historical analysis, unless you're looking at things like, okay, what actually existed in the world, you're asking, what kinds of burdens did laws impose? That's a legal question. The Supreme Court made clear in the footnote after the party presentation discussion that Your Honor is referencing, that the historical questions that it's asking there are legal questions, and you don't defer to experts on legal questions. So while there might be some circumstances in which deference would be appropriate to experts' determinations, there are pretty few and far between, and there's just no dispute that the numbers that we're talking about here are just orders of magnitude greater than what one could even plausibly call unusual. And even if you want to, you know, walk away from the highly unusual, I mean, the typical person who possesses and uses one of the arms that Rhode Island now bans does so for lawful purposes, including self-defense. Let me make sure I understand the ramifications of your argument. I think that there's, what,  that have so-called assault weapon bans. Yes, Your Honor. And the federal court, the federal government used to have an assault weapon ban that expired. Yes, Your Honor. If I understand your argument, all those statutes are unconstitutional. So, yes, with some caveats. So it depends on how broadly they sweep. So... But to the extent all of them said you can't have a similar, what's... what is it, an AR-15 or something like that? Yes, Your Honor. I mean, the AR-15, 24 million of them are owned currently by, you know, somewhere between 8 and 10 million Americans. And your argument is it's too late for the people's representatives and their various legislatures to do anything about that? So I don't think it... I don't think too late is the right way to think about it. I mean, when you're talking about a tradition test, of course, you're going to look to the past. But when it comes to arms that have been on the market, here we're dealing with arms that have been on the market for 100 years. And we know what the tradition is with respect to semiautomatic firearms and feeding devices that allow semiautomatic firearms to function semiautomatically. The tradition has been one of almost no regulation and no bans at all. And what the Supreme Court says courts are to look to in doing the historical analogical reasoning is, is the burden that was imposed by past laws similar in the how and the why? And as the Ninth Circuit explained in Teeter a couple weeks ago, how means how does it regulate? What conduct is regulated? And a ban regulates different conduct than any of the types of other laws that the other side wants to rely on. The other side looks to concealed carry laws and gunpowder storage laws, all of which may impose some level of restriction. But, you know, a concealed carry law, for instance, restricts one-half of one-half of the textual right to keep and bear arms. A law that says you can no longer possess these arms takes away the entire ballgame, the right to keep and bear arms altogether. That's why the Ninth Circuit in Teeter in dealing with... But what if the dangerousness of the particular weapon becomes more and more obvious? Are you saying the legislatures in this country cannot react to that by banning them? Yes, Your Honor. I mean, that is clear from the Bruin opinion. But what Bruin said is we've had 12 years of courts deferring to legislatures' judgments on those sorts of things. And what we've seen is a large-scale curtailment of fundamental rights guaranteed by the Constitution. What if the legislature, state legislature, says, well, we created history, we were wrong, and we're going back to what's right? That still is no good. Correct, because the rights don't belong to state legislatures. The rights belong to the people. And if state legislatures want to change that right, there's a mechanism in our Constitution to allow them to do so. But the way to do that is not to curtail what the historical tradition is, because that's what the Supreme Court said the touchstone is. Let me also ask you. Let's assume the Rhode Island statute, instead of banning the high-capacity magazines, had said you can only... You cannot possess more than, let's say, one, two, or three high-capacity magazines at a time. Would that still be unconstitutional, in your theory? So it would be a much tougher case. So, I mean, the reason why this is an easy case is arms bans basically never happened in this country. There are the machine gun bans, which I'm happy to talk about, and why they're different, and why they actually support our understanding of the historical tradition. But other than the machine gun bans, there is no tradition of banning arms outright in this country. And with respect to these arms, we know that there's no tradition of banning them, because from the 1890s to the 1990s, three states and D.C. were the only ones that swept them up. But didn't Rhode Island's 1927 legislation, if I've read it correctly, seems to ban these weapons because it defines machine guns as basically semi-automatic weapons? Yes, so there were three states and D.C., including Rhode Island, that defined machine gun to include semi-automatic weapons. So three states plus D.C., which is where it came later. All of those laws were repealed. The Supreme Court's made clear that what you're looking for in a tradition is what's well representative. And, you know, there were other states that the Supreme Court looked to in Bruin that didn't allow anyone to carry in certain circumstances, and they said, that's not representative of the tradition. And, you know, we've looked at all of the cases in the Rhode Island reports, the Michigan reports, the Massachusetts reports from this era, and we couldn't find a single prosecution under them for somebody who had a semi-automatic firearm. And I think that makes sense because they were early machine gun laws. Yes, they textually, like, we don't dispute that there are those four laws that textually very clearly covered. May I continue? Yes. They very clearly covered semi-automatics, but they were early machine gun laws. And the fact that they were later repealed and replaced with true machine gun laws that only cover continuous firing with one pull of the trigger, you know, and the fact that we haven't been able to find a single prosecution under them for semi-automatics, I think just proves the point that there is no tradition in this country of regulating these types of arms. You save five minutes for your rebuttal. Thank you. Thank you, Attorney Rowan. Will Attorney Rice please step up to the podium and present yourself for the record, please? May I please the court? Sarah Rice on behalf of the Rhode Island defendants. I'd like to start, if I may, with the end of plaintiff's argument because I think it's a good place to be. First, as I think your honors noted earlier on, the district court did not have a chance to go statute by statute and evaluate the claims that first appeared in the plaintiff's reply brief that would limit the number of statutes that were applicable to semi-automatic weapons. I think this is important to know because in the interim between briefing, there's been a number of district courts that have considered this and have agreed, more or less, with Rhode Island's recitation of which statutes, and it's a little bit broader. Are you talking about court decisions that haven't yet been brought to our attention? Yes, your honor. If you are, you should file a Rule 28J letter. We can file those as a 28J letter, but just to let you know that we sort of have this preservation problem on the front end. These arguments about those statutes that Rhode Island did raise below were not raised below, and so the district court did not have the benefit of looking at the plaintiff's arguments related to them, and it really does go to the history and tradition. Rhode Island put forward evidence throughout all stages that the minute that high-capacity arms came into American usage, they have been regulated. We started in 1866 during the Civil War with Henry and Winchester rifles and demonstrated through the use of expert testimony that these weaponry were actually prohibited from civilian use. Whenever there was danger of those weapons falling into civilian hands, they were interdicted by the United States Army, and this is really important because as we know from Bruin and Heller, it is that post-ratification or post-founding, if you're talking about the federal government, conduct and treatment of that regulation that really lets us know what was meant at the time. So how did they get to be millions and millions of these weapons out there in people's hands if there was a long tradition of outlawing them? Certainly, Your Honor, and I think that this goes back to the 1994 through 2004 federal ban. There were not necessarily millions and millions and millions pre-1994. This is another factual issue that did not come up before the district court. These arguments were not made in depth to the district court. Plaintiffs did not put on the same survey evidence that they had presented in their briefs before the district court. Again, the survey evidence, as every town pointed out in their amicus, has been questioned before other district courts. So there are answers about the marketing and sales of firearms, the practices of manufacturers and marketing firearms that explain exactly what these numbers mean and why they might not, at first blush, sort of get to whether they're in common use for self-defense today, which is the operative question here. And I think that that's... What are you suggesting, Ms. Rice? The district court didn't consider or pass upon these materials? That would normally prompt me to say, well, we ought to vacate this decree and remand it to the district court so the district court can consider it. But I don't think that's the result that you're urging. No, Your Honor, and thank you for the redirection because I don't think you need to consider any of these materials, and the district court did not consider any of these materials in Regent's decision. This is a preliminary injunction appeal. So the district court denied the preliminary injunction, knowing that it would have further opportunity to consider any number of evidentiary issues that plaintiffs might want to raise during full trial on the merits. And it did so for good reason. It held that the plaintiffs did not have a likelihood of success on the merits because they stumble at the first step, whether or not large capacity feeding devices are arms. This is a very important point because plaintiffs now have tried to state that there is some extension, that Bruin extended what Heller told us, but it really didn't. Heller told us that arms is fixed in history. The corollary, and the only corollary that the Supreme Court has made to that test, the historical definition of arms is Caetano, which said the historical definition of arms, obviously, like other constitutional rights, expand to fit modern circumstance. Caetano said, yes, this would expand to weapons that were not in existence at the founding. But that's not what we have here. A large capacity feeding device is simply not a weapon. That's what the district court analogized below. That's what we have explained in our briefs. And it's true. A large capacity feeding device, most of which now the commonly used firearms accessories that the plaintiffs talk about are owned by all, are completely separate devices from the firearms. But the firearm that they own isn't operable in the absence of a system for the delivery of the bullets. Most firearms... So I don't understand why a magazine isn't an essential component of a firearm, and therefore a firearm with the meaning of the phrase arms as that's been used by the Supreme Court. So there's a couple different answers to that. One of those is that there are firearms that exist that do not use magazines. And the district court, in fact, talks about this. It talks about how a plaintiff's expert even identifies a very common firearm that doesn't use a magazine, the revolver. That was in existence then. It's in existence today. And that existence of that kind of a firearm, again, a small arms, a sidearm, something that people would use in self-defense that doesn't have a magazine, means that you don't have to conflate these two categories of things. The second is that we really are bound by the historic usage of the word arms at the time that the Second Amendment was drafted. And we know from historic usage in dictionaries that arms mean a weapon of offense or something that's used to cast or strike at another. A magazine simply is not that. It is a firearms accessory. At the time of the founding, firearms accessories... So let me... Go ahead, Judge. So at the time, so let's look at 1790s. Suppose Congress had outlawed ramrods. Would that have been constitutional on the grounds that, well, they're not an arm, they're just used to load the musket? So I think that this, again, gets back to a corollary that I think some circuit courts have looked at in the past and found that this means that the accessory is itself an arm and would fall under the plain text of the Second Amendment. But that's not actually how we need to evaluate constitutional rights. Whether it be a ramrod or a magazine, the conduct that you're looking at when you make that constitutional evaluation is the right to bear the principal firearm. So in that case, a musket. In our case, a semi-automatic handgun. So I'm not sure what you're saying in response. Could Congress in the 1790s have outlawed ramrods? So I do not think that Congress could outlaw ramrods altogether, but that doesn't mean that they could not pass a public health and safety regulation about the type of ramrod that is permissible. So I don't think ramrods really differed very much at the time. They're basically all made of the same material. But say you had a ramrod that was made out of lead, and they knew in the 1790s, which was counterfactual, they knew that that was dangerous. They could say, you cannot have a ramrod made out of lead. Or perhaps it was ineffectual. That's a more historically accurate reason why they might have said, you have to have this kind of ramrod. And in fact, there's laws like that all over the place in colonial America, saying, you must have this kind of cartridge box. You must have this kind of accessory. Which is the flip, but it's not really any different. We were making laws about what types of weapons accessories were the acceptable and safe choice. But isn't that bootstrapping, Ms. Rice, because you're assuming that the magazine is an accessory? It doesn't get to my question that it's an integral part of many of the weapons which are owned and possessed by Rhode Islanders, and I struggle with the notion that given the definition of arms that the Supreme Court has given us to work with, that we can't consider the magazine as falling within that definition. Despite plaintiffs raising this argument, they have never once, not in the district court, not in their briefing before this court, not in oral argument that we just heard, ever identified a single firearm that could not function without a large capacity feeding device. That it could be modified. That it could be swapped out. And in fact, there was a lot of evidence introduced below that manufacturers are now making standard compliant magazines that can be used with the types of firearms most commonly owned by Rhode Islanders. So it simply has not been part of this record that there is any instance that a Rhode Islander would be deprived of the right to carry or possess their principal firearm because of this regulation and because of large capacity magazines. Let me also ask you this. The statute does not preclude anybody from owning a capacity magazine. I won't say large capacity or high capacity. It's up to 10 rounds. Any citizen can have a magazine that has 10 rounds, correct? Correct. As long as they are otherwise able to possess a firearm. Okay. But any person who could lawfully possess a firearm can possess rounds of ammunition that are 10 rounds or less. And there's no impediment that a person, for example, have 20 10 rounds magazines on his person. So somebody who conceivably needed to defend him or herself could use one magazine. And again, my experience is you can put them and take them out very quickly. But that person, it's not defenseless, correct? And still can have a very large amount of rounds of ammunition with the firearm and still defend him or herself, correct? That's correct, Your Honor. And that in fact makes this restriction narrower than a lot of the public health and safety laws that were passed by Massachusetts, Rhode Island, and other colonies that regulate gunpowder, where there was a very strict limit on the amount of gunpowder that you could keep on hand at a time. And Rhode Island could have said magazines up to 20 rounds or 15? It's legislative power to say, yes, you can still have magazines, but up to this limit, correct? Correct. I think that that's correct. And I also think that 10 rounds is consistent with our history and tradition. We know that that's about where people started to regulate when they made capacity restrictions on semi-automatic weapons around the advent of machine guns. Then we have to historically go back and say, is it reasonable for 10 rounds or maybe larger magazines to read it? Because historically, I'm sure there were larger capacity magazines back then, but don't we sort of say historically reasonable? Is this historically reasonable? Yes, but we don't have a straight jacket when we were looking, I think is the term that the Supreme Court used. That's sort of what I was asking. There is some room, as long as we have a relevantly similar analog, which we do here. We have the relevantly similar analogs in, again, the conduct of the United States military in interdicting these large capacity firearms from the civilian public. We have the historical analog of the very early modern prohibitions on both machine guns and semi-automatic weapons, which were often coupled with a capacity restriction. It's something that we've always known can make a firearm more dangerous, and we certainly have that knowledge today, and more dangerous than is necessary for self-defense, but not even necessary, that's useful for self-defense. What are we to make of the relative modesty of this legislation in terms of, in one respect, it would seem to impose very little burden on the right to bear arms, that you have to, your magazines have to be limited to 10. On the other hand, it would seem to do very little to reduce the dangerousness of the weapons. You're talking about what, adding on two or three second delay after your 10th shot? So, Your Honor, I think there are two answers to that question. One, I do think that Bruin did tell us that we can no longer balance the interests of the burden and the effect of the legislation. No, but it does tell us that we should pay attention to the extent to which it burdens the right of self-defense. Correct, and that would come into play when we're looking at how and why. So, the why here, I think, has also, again, been set forth in this record, has also been considered by appellate courts throughout the country pre-Bruin, and that is that two to three second pause has actually functionally made a difference in major mass shooting events. In Newtown, there's documentation that it allowed elementary school students to run out of the classroom when a magazine change occurred and was jammed. I think the shooting of... Is there agreement between the parties on that point of history? There's certainly been no evidence to the contrary introduced by the plaintiffs. Let me also ask you, going back to my hypothetical, Rhode Island law does not preclude a person who could lawfully possess firearms from having 15 firearms in his house or on his person, carrying two or three multiple firearms, right? You can carry them as long as each has 10 rounds or less. You can have a trunk in your car, and if you need to defend yourself, that doesn't preclude it, right? Yes, Your Honor, as long as that is consistent with all sorts of other things. I pause only because it happens to be that when someone has very many firearms,  but somebody who has 15 or 20 legal firearms with capacity magazines of 10 rounds each and then additional magazines is not violating any law and can still defend him or herself. That's correct. With those two-second pauses, of course. Correct. Or you shoot one of your ambidextrous, like in the cowboy movies or something. One of the wonders of modern life is that there are very many different configurations of firearms that one could possess, and this one limits just one small sliver. This regulation regulates just one small sliver of those configurations. So back to the procedural status of this, there's a motion below or an injunction. Correct. And there's a ruling then denying that injunction based on a finding that the magazines are not arms. Correct. And then there's an appeal, and if we were to agree that they're not arms, then we reject the appeal. Correct. But if we were to find that they are arms, then we would have overruled the grounds cited by the district court for denying the injunction, but we would not have yet heard from the district court on what I've called step two under Bruin. That's right. The district court did not reach it. You would have us, on our own initiative, find that that is an alternative basis for affirming the denial? Yes, Your Honor. Those grounds were presented below as bound by the record there. The plaintiffs gave, I think, a very different view of their arguments on the historic tradition than they did in their briefs before this court, but those arguments were briefed by the parties below. But we have no findings by the district court, and some of those arguments, it seems to me, could use some back finding. I think. Is that so? For example, your argument that these 10 capacity magazines can always be replaced with lower capacity magazines and, therefore, are not disabling to the weapons. We don't know that, and that, I gather, is disputed by the appellants. Your Honor. Certainly, your history and tradition arguments are disputed by the appellants. The particular question of whether there was a firearm that could be rendered inoperable because of the capacity beam device restriction was briefed below. It was briefed, but there's a difference between an issue being briefed and this court having the benefit of findings by the district court. If it's an issue that could be put in better perspective by fact finding, that's why we have two different layers in the court system assigned different functions. Fact finding to the district court, review to our court. In other words, shouldn't we, if necessary, remand the case for the district judge to provide findings? And we do this in sentencing cases all the time. There's no way for us to know why the person was sentenced. We send and let us know what your thought process was, and then the matter, you're still going to come back here if necessary. Certainly. I think there is a reason not to do that in this case. This was a preliminary injunction motion. It was an affirmative burden by the plaintiffs to demonstrate a strong likelihood of success on the merits. There was an opportunity below for the plaintiffs to demonstrate the use case that you're talking about. In fact, there was an affirmation or kind of an assertion that there could be some type of weapon that fell within this category, but no such weapon was identified. That was an affirmative failing by the plaintiffs below. And so in that case, that record should stand. And instead, the state's presentation of the evidence that there's no real there there should be upheld. Let me also ask you if the preliminary injunction were to be maintained, that doesn't preclude you from going back to the district court, and Judge Kayada mentioned going to step two or ultimately prevailing on a permanent injunction. That's correct. The district court can be affirmed. The preliminary injunction may be denied, and a full record could be developed in this case, and the case could come back to you at a later date after that record was developed, even if the denial of the preliminary injunction is affirmed today. Thank you. Thank you, Your Honors. Attorney Rowan, please reintroduce yourself for the record. You have a five-minute rebuttal. Once again, Matthew Rowan for the plaintiffs. Just a few quick points. I want to start with a methodological point. So I heard my friend on the other side say that the plaintiffs didn't put on evidence on types of laws and that the plaintiffs didn't put on evidence of replaceability. Respectfully, it's the government's burden under Bruin. Bruin says that it's the government's burden to demonstrate that its law is consistent with history and tradition 26 times. It's very clear. Well, that's for final judgment, right? No, it's for final adjudication of the case. But what about for an injunction? That was a motion to dismiss in Bruin, and so the legal standard that applies is the same on 12b-6, and it is under a preliminary injunction and a permanent injunction. The legal standard is the same. The plaintiff's threshold burden is slight. All the plaintiff needs to show is that the conduct that they want to engage in, that the law restricts, is covered by the plain text. For all the reasons I've already explained, I think we're clearly past that here. And then it's the government's burden to come forward with their theory as to why the law that they have passed now regulates in a manner that's consistent with history and tradition, and respectfully, they don't have any historical analogs that regulate in anything close to the same way because none existed. And I commend the court to the Teeter case where we filed the 28-J letter that looked through all of the laws that they have cited and said none of them is relevantly similar to a ban on a class of bearable arms. Let me ask you if we were to affirm the preliminary injunction as I was asking sister counsel. Well, no preliminary injunction has been entered. I mean, if we affirm right now. Well, I would ask you not to affirm because the district court ruled against my clients. So if you were. I mean, if we reversed. Yes. I was asking her. Sorry. The case still goes back. Yes, Your Honor. So look. Counsel would have another opportunity because it's to make her arguments. Sure. There's no record. No step two. So that's right. I mean, what I would say is I don't think there's a need to remand. You know, as I, you know, I was talking with Judge Chiara and Judge Sellier before, but yes, there are types of issues where you want, you know, airing by the parties and decisions by district courts. But at bottom, when you're talking about what laws used to exist and what kinds of burdens they imposed, those are legal questions. I mean, again, I keep going back to the Ninth Circuit's decision in Teeter. They specifically rejected the argument that they needed to vacate and remand to the district court because they're like, we're judges. We can look at these laws ourselves. Let me give you an example. What about, take M-16s. Yes. There's some suggestion by the Supreme Court, as I read it, that those perhaps could be barred from ordinary citizens not in the military possessing. Yes, Your Honor. And just quickly, I mean, the reason why that's so after Bruin, we know, is because it's consistent with our history and tradition of prohibiting machine guns. Right. But what, in history, you have the military weapons and you have the civilian weapons. Technology changes over time and they start to, one starts to look more like the other. Well, but we're talking about technology here that's existed for 100 years. I mean, machine guns first came onto the market in the 1920s. The auto ordinance company marketed them very hard. Yes, but your clients don't take the position that the guns are no different than they used to be. Some of the guns that are banned by this law are 100 years old. So, yes. And the technology, the semi-automatic firing technology, which, to be clear, if you accepted the district court's first holding and their argument that no ammunition feeding device is an arm. I'm talking about step two. Well, at step two, then the question is just, you know, with respect to a class of arms that has existed for a long time, the fact that there's no difference between a modern semi-automatic feeding device and one from 100 years ago, except for they're now double stacked. The only difference is you now can have two lines of rounds in a shorter thing so that it's easier to wield. So I just want to make a few sort of last points. I mean, one, if you accepted the district court's argument, the district court's conclusion and my friend's argument on the other side, then the state could ban all semi-automatic firearms. That is clearly, without even implicating the Second Amendment, that's the logical consequence of their accoutrement argument. That's not consistent with what Bruin set up. You know, the district court then said, well, you know, people don't need more than ten rounds. Need, respectfully, has nothing to do with it. The question and threshold is just whether something facilitates armed self-defense. That means makes easier, which is very far afield from need. Let me ask you, counsel, the same question I asked opposing counsel. The ban here is not a total ban. If you have less than ten rounds, you can still have a capacity magazine. So respectfully, that's the same argument that the District of Columbia made in Heller that the Supreme Court rejected. So D.C. said, well, you can have long guns. It's not a total ban. And the Supreme Court said, that's not how the analysis works when we're talking about constitutionally protected conduct. And the conduct here is possession of arms. And a class of arms has now been banned. And, you know, you could say, well, handguns are somehow different. But respectfully, you can define handguns by a firearm with a barrel shorter than 20 inches. You can make the definition in a way that's very similar to the type of definition that we have here. So, you know, I understand the impulse to go to, well, you know, like the state has a strong interest, and this doesn't seem like it really sort of under- What if it's 20 rounds or 30 or 40 rounds? So then you really do look, I mean, the test that the Supreme Court set up, like, actually addresses this. So, you know, we don't know the numbers. I don't know the numbers offhand for 40-round magazines, for instance. So it may well be that there is no great tradition in this country of possessing 40-round magazines. And if that were true- What's the tradition? What, you know, 20, 15, 25? Well, as the majority in Heller 2 made very clear, it's surely not 10. That's a direct quote from the D.C. Circuit. And, yes, they ruled against our position under intermediate scrutiny. But, I mean, there are hundreds of millions of these that have been owned for 100 years. And so, you know, maybe there are numbers above 10 at which the state could do this. You're saying 100 years ago, 100 million Americans had magazines? No, Your Honor. If that's what I said, I misspoke. I've said these have been on the market for more than 100 years. Right, but how many Americans possess them? Currently? No, historically. A very large number. What are you citing to say that referring to the 1920s that a large number of Americans possessed magazines with more than 10 rounds? So if I understood your question as over the span of the 100 years, it's a very large number. I don't know offhand what the number was in the 1920s. How about the 1950s? So we do have AFMR sales data, and we also know in the 1950s, for instance, that the United States But sales don't tell you who they're going to. Well, yes, they do because there's a federally licensed system. Well, they tell you they go through a dealer, but whether a straw person bought them or not, how do you know? You're counting assault weapons sold in the hands of the Mexican cartels. I don't think that's quite right to say that I'm counting American criminals. Well, if you're counting sales volume, you are. So what we have is the sales that are made to we know sales data, we know the primary person to whom they're saled. We have those records for almost 70 years. And you can say, OK, maybe the number instead of 560 million, maybe it's really only 500 million. I don't think anything particularly turns on that. But again, you're talking about the volume of the magazines. You're not talking about the number of Americans that possess them in particular. Sure, if you want to talk about the number of Americans who possess them, I mean, it's Professor English's study found that 48% of American gun owners, which is 20% of American adults, have owned at least one of these in the last 10 years. So you're saying 10%? Sure, a very large percentage, something that dwarfs the number in Caetano by orders of magnitude. And if I could just say one quick point on the 5th and 14th Amendment. I know I'm far over my time, with your honors. I'll give you 30 seconds. Sure. So if their argument is correct, then the state can come in and say, we think that anything that you possess is now too dangerous. We're going to take it from you, and we're not going to give you any sort of compensation for it. I understand that they think that there's a menu of options that allows you. Are you talking about the takings issue now? Yes. I don't think that's really fair rebuttal. So we're all set. OK, thank you, your honor. That concludes arguments in this case.